Good morning, Mr. Caldwell. Good morning, Your Honor. It's good to see you back here. Thank you. Good to see you, too. May it please the Court, my name is Mark Caldwell. I'm representing Mr. Knape in this Social Security Disability Hearing. It's a preliminary matter. I will, of course, keep track of my own time, but I am going to try to reserve two minutes for rebuttal. I thought I'd lost Judge Ellis there for a minute. I turned around and saw an empty microphone. I think this case can be simplified a little bit by focusing on two issues. The first is the ALJ improperly discounted Mr. Knape's symptom testimony, and the second thing is, is the ALJ improperly relied upon the consultative examiner's opinion, Dr. McLean. Regarding the claimant's symptom testimony, of course, I would emphasize that the standard that this Court uses is a very high standard of specific, clear, and convincing reasons. As the Court knows, the ALJ only focused upon the physical impairments, the what they call extrapyramidal symptoms, tardive dyskinesia, torticollis, those sorts of things, and found that the mental impairments were not severe. What strikes me as odd about that is that the physical symptoms upon which the ALJ focused were a result of the very powerful psychotropic medications that Mr. Knape was taking for his mental impairments. If anything, that should up the credibility of Mr. Knape's... So he could stop the jerking movements, the dyskinesis, by stopping the medicine, and then he would be back in his bipolar suicidal situation. Is that where we are? Well, actually, I'm not a doctor, so forgive me for saying this, but I just happen to know it. These symptoms don't necessarily go away. If you have tardive dyskinesia, and basically you're sticking out your tongue every 30 seconds, you stop the medication, that doesn't go away, and there's nothing that can be done to cure it. You have that for the rest of your life. And again, forgive me, I'm just, I know it. I can't pretend I don't know it. Well, even assuming he could stop it by stopping the medication, he'd still be back with his, if he stopped the medication, he'd still be back with his bipolar suicidal situation. Correct. Correct. And Mr. Knape was not ignorant of these horrible side effects. The record shows that he was advised about them. And yet, knowing of these symptoms, some of which he actually suffered from, the torticollis and those sorts of things, he nonetheless subjected himself to that drastic treatment. Doesn't that say everything about Mr. Knape's credibility, that a person would subject themselves to that drastic treatment and actually suffer from some of those horrible side effects? And his neck was twisted to the, I think it was the left, all the time. So if he was willing to subject himself to those side effects and the doctors were willing to prescribe those medications knowing that they could cause those side effects, that says everything about Mr. Knape's credibility and not wanting to end up in the hospital, like he did twice during the period of time we're talking about, and how he wanted to improve his condition. Would you explain this, ALJ relied on Dr. McLean, who was a psychologist, who did see him. Correct. And apparently he was not exhibiting these problems at the time that he saw Dr. McLean. So what do we do, how do you explain that? Again, forgive me, I'm playing doctor a little bit here. Those side effects can come and go. So the fact that during the... Is that in this record? No, it is not. But it is in the record that the side effects waxed and waned, went up and down in terms of severity. So the fact that they were lesser at any one particular time, and this is in the record, that they were lesser at any one particular time, doesn't mean that they weren't observable at other times. And, you know, I could take the rest of my oral argument, going through page by page by page by page by page by page, where the treating physicians, counselors, psychologists, whomever, observed these symptoms. I mean, it is legion throughout this record. So the administrative law judge himself interpreted Mr. McLean's symptom testimony, sorry, McLean's a psychologist, Mr. Nape's symptom testimony, to be a person who would be off task 10 percent of the time. Now, that's the ALJ's characterization. And the vocational expert testified without contestation that a person who had that limitation would be unable to perform sustained work. I suggest that that should be the end of this case. Under the Lingenfelter precedent, this Court has said a claimant's symptom testimony alone can be a basis for remand for determination of benefits. And that's what I urge. Let me briefly touch upon Dr. McLean's report. Dr. McLean's report is rather confusing. Dr. McLean said, I reviewed the background medical records. I want to change that. The ALJ said Dr. McLean had reviewed the background medical records. There is nothing in Dr. McLean's report that indicates she had, in fact, done that. Had she done that, there might have been a different conclusion. Your Honor, please. In the ALJ, in discounting Dr. Hecaneos? I'll go with that pronunciation. Dr. Hecaneos' testimony basically just decided that the findings were outside of his area of expertise. However, completely ignoring that Dr. Hecaneos was a primary care physician, is that correct? It's correct, and it's wrong. And that primary care physicians, in fact, treat their patients' mental illness all the time and do prescribe psychotropic medications to their patients to treat their mental illness. Sprague, S-P-R-A-G-E, excuse me, A-G-U-E, and Benton, as well, recognized the importance of the primary care physician's role. So that is yet one more important factor. To save time for rebuttal? I am. Thank you for seeing me look at the clock. I want to make one more point. Dr. McLean made her assessment while the claimant was in a assisted living situation. That's very important. Thank you. Thank you. Good morning, Your Honors. Joseph Leinkammer on behalf of the Commissioner. This appeal is really about the ALJ's finding that Nape did not have severe mental impairments. And there are really two key pieces, points, that I want to make this morning that support the ALJ's decision on this issue. Number one is the consultative examiner's opinion. Dr. McLean's stated that Mr. Nape reacted well to medication and she assigned no specific work-related limitations based on Mr. Nape's mental impairments. And under this Court's precedent in Tonopetian, because Dr. McLean's examination rested on her own independent clinical findings, that constitutes substantial evidence. In addition, the second point is that the medical evidence in this case demonstrates that over time, Mr. Nape did, in fact, improve with medication. And we have multiple instances of this. For example, in February 2013, in the year leading up to the ALJ's hearing in this case, February 2013, Mr. Nape states, I'm doing well. His doctor noted that he was, quote, unquote, much improved, no psychotic symptoms, his concentration was good, his memory was intact. Going forward a few months, in May of 2013, Mr. Nape again says, I'm happy with the program that I'm in. His doctor notes that he continues to do fairly well on his current treatment regime. No, he deserves a lot of credit for that, it seems to me. But in December 2012, as I understand it, he tried to commit suicide by hanging himself and cutting his wrists and taking an overdose of medication. And then after that, he was living in a supervised living situation. So, the fact that he looked good and said he was feeling better in light of that seems a little doubtful support for saying that he can do full-time work. Well, there's no question, Judge Schroeder, that Mr. Nape does have mental impairments. And the ALJ didn't find to the contrary. The ALJ noted at Step 2 that Mr. Nape had medically determinable mental impairments. But the question at Step 2 is whether or not those mental impairments significantly limit Mr. Nape's ability to do basic work activities. Now, as Your Honor points out, he did go to the hospital in late 2012. But when we look at the treatment notes there, we see that he did commit suicide. Correct. Yeah. And we see – but what we see is under treatment and with adjustments in his medication, he improved. And over the course of – in 2012 and over the course of 2013, there are numerous instances, not just of Mr. Nape reporting that he felt better, but of doctor's observations that Mr. Nape had – was, quote, unquote, much improved. For example, in July 2013, kind of going forward with more treatment notes, this was just a few months before the ALJ's hearing. His doctor examined him and found that his concentration was good, his memory was intact. He continues to do fairly well on his current treatment regimen. So, yes, there's no – there's no question that he had – there were, I think, two instances where he went to the hospital, which is – which obviously indicates serious symptoms at that point. And he also had this dystonia and tardive dyskinesia, which the ALJ said are severe impairments caused by his medication for the bipolar disorder. Correct. And that's a somewhat of a – that's a separate issue. That's looking more now to what are Mr. Nape's physical impairments. And, yes, the physical impairments that – Well, we're looking at the person. Correct. Correct. But the physical impairments that come from this case are from the side effects of his medication. Which is for the mental impairment. Correct. But when we look – but when we look at what the physical impairments are, the ALJ accounted for those physical limitations on – this is on page 27 of the record. The RFC does, in fact, include limitations to account for the non-exertional limitations, cannot climb ladders, ropes, or scaffolds, and the claimant can only occasionally balance. And the key to this is the ALJ accounted for the credible physical limitations with respect to his – to the involuntary muscle movements, but explained why he – why those limitations were not disabling. And, for example, on page – and this is in the ALJ's decision starting on page 28. Treatment helped those conditions. So, for example, on page 805, injections gave him a, quote, unquote, quantifiable 60 to 70 percent benefit for stiffness, tightness, and pain. If we move on, there were times when his neurologist observed no tremors at all. He had a normal range of motion in his neck on several occasions. And, in fact, he underwent testing for abnormal involuntary movements and scored a zero. That's on page 689. So, yes, there were side effects, as my colleague pointed out this morning, but when – but the ALJ considered those, accounted for the credible limitations stemming from those, but explained why they were not disabling and why Mr. Nape's primary condition was not in accordance with the residual functional capacity. So, just to kind of – so, counsel made several other points today that I wanted to quickly address, and I think, Judge Ellis, you mentioned Dr. Hackenjose's opinion. The fact that Dr. Hackenjose was a treating physician, yes, that is a relevant consideration. The ALJ recognized that Dr. Hackenjose was Mr. Nape's primary care physician, but provided specific and legitimate reasons for assigning – for discounting Dr. Hackenjose's opinion. So, the treatment relationship is just one factor to look at. Specialization is another factor to look at here, and we have a psychologist who is – However, one of the – basically, what the ALJ said was that Dr. Hackenjose is a primary care physician, and therefore, this is outside his area of expertise. Well, as one point – made that as one point, correct? And primary care physicians see the entire person, and they see a gamut of people, from babies to geriatric patients, and the primary care physician is actually the first point of contact for most people who suffer from mental illness, and they are eminently qualified to treat people suffering from mental illness. They prescribe medications. They prescribe psychotropic medications. They make recommendations for other outside resources, and they make referrals. So, to say that this is outside of his area of expertise is patently false. Well, Your Honor, I think what I would stress is that what the ALJ's point was in recognizing that Dr. Hackenjose was a primary care physician was that unlike Dr. McLean, who specialized in psychology, Dr. Hackenjose was a primary care physician and didn't necessarily have the specialization that Dr. McLean had, and under 20 CFR 404, 1527 C5, an ALJ may give more weight to the opinion of a specialist. So, it's not – But the specialist here wasn't even a medical doctor. The specialist, I believe, was a psychologist. Right. That's not a medical doctor. That is not a medical doctor. But the psychologist does constitute an acceptable medical source that the ALJ is entitled to. And can't prescribe medication, whereas Dr. Hackenjose can prescribe medication, and Dr. Hackenjose is aware of the side effects of medication, can alter medication to deal with certain side effects or change medication to deal with certain side effects. And Dr. McLean, if she had a patient, couldn't do any of those things and would have to actually rely on a psychiatrist. And, Your Honor, I mean, that is a point well taken. I do think that it's important, though, to also keep in mind that that was just one reason the ALJ provided for discounting Dr. Hackenjose's opinion. There were other reasons as well, including inconsistency. For example, Dr. Hackenjose said that Mr. Nape's condition was very uncontrolled. But as the ALJ pointed out, there were numerous treatment records in 2012 and 2013 that showed that with medication, Mr. Nape's condition was doing relatively well. And during that time period, he was hospitalized twice. He was. And you cannot be hospitalized for a mental condition if it is not severe at that time. The hospital will not take you unless you are a threat to yourself or others. And as I pointed out earlier to Judge Schroeder's questioning on this issue, what we do see in the record is relatively quick improvement and then a long period of time where when he is on the treatment regimen that he was on over the course of 2013, improvement, much improvement in his symptoms. But not to the point where he could live independently. He was. Correct. He was living. I believe he was in a program where he, where it was, I think he had to check in and see and go to treatment at a certain set times. But he did actually tell Dr. McLean that he thought he could live independently. And we believe that, but we don't believe anything else that he says about what he's experiencing. Well, we do. I mean, we do see statements in the treatment records from Mr. Nape himself saying that he's doing well and that he feels as if medication is improving his symptoms. Yeah. You're in the red. Okay. Thank you. Mr. Nape wants to live outside a supportive living situation. I want to be an astronaut. That isn't going to happen either. I want to talk about two cases that counsel referred to, Tana Peckin. That was a case of an examining doctor up against a treating doctor. And the treating doctor provided no evidence of the underlying impairments, let alone the symptoms. To quote this court, not even a clinical observation. Improvement throughout this case? Yes. I don't disagree with that. Is it sustained improvement? No. The Luster and Garrison cases specifically say that periods of improvement do not gainsay the overall finding of disability. Mr. Nape was discharged from the hospital because he was improved. That's why you discharge people from a hospital, is because they've been improved. That doesn't mean they can function on a sustained basis. Dr. McLean did some testing. A very careful reading of her report is important, because she administered the Ray test, R-E-Y. And she herself says, that's a test for malingering. And what did it show? No malingering. That is all the more reason, in addition to what I've already said about the administration of the psychotropic medications, why Mr. Nape's testimony and the vocational expert's conclusion based on that should be the basis for this Court's remand for determination of benefits. Okay. Thank you. Thank you, Your Honors. The case is argued. The case is moved.
judges: Schroeder, Kozinski, Ellis